**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

SIMON ELIAS,

     Plaintiff,

    v.

JOSEPH PELEG d/b/a ACE OF TRENDS,

     Defendant.

Case No.  1:25-cv-7852

**COMPLAINT**

---

Plaintiff Simon Elias ("Plaintiff" or "Elias") by and through his undersigned attorney, hereby submits this Complaint against Defendant Joseph Peleg d/b/a Ace of Trends ("Defendant" or "Peleg"), and alleges as follows:

## NATURE OF THE ACTION

1.      This dispute involves a deceptive futures trader, Joseph Peleg, who deliberately misrepresented his experience, his licensing status, and his capabilities to induce investors, including Simon Elias, to invest substantial sums of money for the trading of futures at Peleg's direction and control, resulting in significant losses to Peleg's investors, including Mr. Elias.

2.      In the spring of 2022, Joseph Peleg approached Simon Elias with an investment opportunity. Peleg represented to Elias that he was a licensed futures trader who had substantial futures trading experience, as well as multiple futures trading clients, and millions of dollars under management. In addition, Peleg promised Elias returns of at least ten percent (10%) per month on

any investment and he explicitly promised Elias that he would make Elias whole on the principal amount if Elias suffered any losses because of Peleg's investments on his behalf.

3. Based on Peleg's representations about his experience, licensure, and that he would make Elias whole on the principal if he suffered any losses because of Peleg's trading, Elias, who had no prior experience with or knowledge of trading futures, ultimately agreed to invest with Peleg. In or around June 2022, Elias invested one hundred twenty-five thousand dollars ($125,000) with Peleg. For the first several months, Peleg delivered on the returns that he had promised Elias, and so Elias invested more money with Peleg. In total, Elias invested three hundred twenty-five thousand dollars ($325,000) with Peleg for futures trading purposes.

4. In March 2023, Elias began to have concerns about Peleg's investment strategy because his returns were not meeting the threshold that Peleg had promised, and in fact, the returns were negative.  Elias raised his concerns with Peleg, who assured Elias that there was nothing to worry about. Peleg told Elias that he simply needed more time for his strategy to generate the promised returns. Peleg again confirmed to Elias that he would not suffer any actual losses, because Peleg was guaranteeing the principal amount of the investment.

5. In reliance on Peleg's promises, Elias agreed to give Peleg the time that Peleg represented he needed to deploy his investment strategy so that Elias could realize the monthly ten percent (10%) return that Peleg promised. Elias also demanded that Peleg provide him with regular updates about Peleg's trades on his behalf and the status of Elias's account/investment. Peleg agreed to provide Elias with regular updates as requested. Peleg also reaffirmed his promise that he would make Elias whole if his trading strategy was not successful.

6. In or around the spring of 2025, Elias's trading account with Peleg had lost substantial sums. In fact, approximately two hundred seven thousand dollars ($207,000), almost

2

two-thirds of the total amount that Elias had invested with Peleg, was gone. Elias attempted to contact Peleg multiple times, but Peleg ignored Elias's communications. Peleg essentially disappeared.

7.     Considering Peleg's disappearing act and the substantial decline of his trading account, Elias began to suspect that Peleg had misrepresented his trading experience, his clients, and his licensing status.

8.     Elias brings this action for violations of the Commodity Exchange Act (CEA), and for breach of contract, breach of fiduciary duty, negligent misrepresentation, fraudulent inducement to contract, and promissory estoppel.

## THE PARTIES

9.     Plaintiff Simon Elias is an individual who resides and works in New York, New York.

10.     Defendant Joseph Peleg is an individual who resides and works in Miami, Florida. Upon information and belief, "Ace of Trends" is a business name under which Defendant Peleg conducts business.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Commodity Exchange Act, 7 U.S.C. § 1 et seq., and its antifraud provisions. This Court also has jurisdiction under 28 U.S.C. § 1332(a)(1) because the amount in controversy exceeds $75,000, exclusive of interest and costs, and is between citizens of different states. Plaintiff is a citizen of the State of New York, residing in New York County, and Defendant is a citizen of the State of Florida, residing in Miami-Dade County. The Court has supplemental jurisdiction over Plaintiff's state-law claims pursuant to 28

3

U.S.C. § 1367 because those claims form part of the same case or controversy as Plaintiff's federal claims.

12. This Court has personal jurisdiction over Defendant pursuant to N.Y. C.P.L.R. § 302(a)(1) because Defendant transacted business within the State of New York by entering and performing a financial services transaction with Plaintiff, knowing that Plaintiff was located in New York, and because Plaintiff's claims arise from those transactions.

13. Venue is proper in this District under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims occurred in this District, including Plaintiff's receipt and performance of the transaction in New York County, and Defendant's communications and conduct directed to Plaintiff in this District.

## FACTUAL BACKGROUND

14. Simon Elias and Joseph Peleg were acquainted via mutual friends.

15. In April 2022, Peleg approached Elias with an investment opportunity.

16. Peleg told Elias that he was an experienced and licensed futures trader, with millions of dollars under investment, including over $2 million from a mutual friend, and a consistent history of generating strong returns for his clients.

17. Elias had no knowledge of or experience in trading futures and had a limited understanding of the investment process and what it might entail.

18. Peleg offered to manage an investment from Elias and promised a rate of return of at least ten percent (10%) generated by Peleg's strategy for trading on the futures market.

19. In addition, Peleg guaranteed that Elias would not lose any of the principal amount that he invested with Peleg. Peleg repeatedly promised to Elias that he would make him whole if there were any losses as a result of Peleg's trading on Elias's behalf.

20.     In return, Peleg asked for fifty percent (50%) of all returns.

21.     Elias did not agree to Peleg's proposal for a fifty percent (50%) commission. The parties ultimately agreed that Peleg would earn twenty percent (20%) on all profits.

22.     Under the parties' agreement, Peleg was to create an account on the trading platform TradeStation Securities, Inc. ("TradeStation") on Elias's behalf. Then Elias would deposit funds into that account, and Peleg would trade with those funds.

23.     On June 27, 2022, Peleg submitted a TradeStation Securities, Inc. Account Third-Party Trading Authorization.  The authorization lists Joseph Peleg as "CEO" of "Ace of Trends."

24.     That same day, Elias deposited one hundred twenty-five thousand dollars ($125,000.00) into the TradeStation account.

25.     Elias's investment immediately started to see returns at approximately the rate of ten percent that Peleg had promised Elias. Accordingly, on July 22, 2025, Elias deposited another one hundred thousand dollars ($100,000.00) into TradeStation account, bringing his total investment under Peleg's management to two hundred twenty-five thousand dollars ($225,000.00).

26.     At one point, Elias noticed that the returns in the TradeStation account fluctuated significantly, but Peleg assured Elias that this was an inevitable result of his strategy. Peleg reassured Elias on multiple occasions that Elias needed to be patient and give Peleg time for his strategy to provide the returns he promised. He regularly reassured Elias of his promise of ten-percent (10%) returns on his investment.

27.     Elias and Peleg would speak every few weeks regarding the status of Elias's investment.  During these discussions, Peleg always assured Elias that his strategy would bear fruit and that occasional dips were inevitable. Peleg also continuously assured Elias that he would suffer

no losses of his principal investment because Peleg would make him whole if the account did not recover.

28.     On September 30, 2022, Elias deposited another one hundred thousand dollars ($100,000.00) into the account, which brought his total investment under Peleg's management to three hundred twenty-five thousand dollars ($325,000.00).

29.     In or around March 2023, the balance in Elias's trading account under Peleg's management had declined to one hundred fifty-seven thousand, two hundred thirty-three dollars and three cents ($157,233.03)—less than half of the three hundred twenty-five thousand dollars ($325,000) that Elias had invested with Peleg.

30.     Over the next few months, Elias spoke with Peleg every few weeks. Each time Elias spoke with Peleg, Peleg reiterated his assurances that Elias's investment would recover and, even if it didn't, Peleg would make Elias whole on his principal investment of three hundred twenty-five thousand dollars ($325,000.00).

31.     In September 2023, the balance of the TradeStation account was only one hundred forty-five thousand, three hundred thirty-nine dollars and sixteen cents ($145,339.16).

32.     Upon learning of the substantial decline in his investment with Peleg, in early October 2023, Elias contacted Peleg by telephone to inquire about his strategy and next steps.

33.     Peleg reassured Elias that his investment was safe. Specifically, Peleg represented that the losses were due to market volatility and again affirmatively promised Elias that if he gave him more time, Peleg's strategy would pay off because Peleg was trading on market volatility and that volatility would provide the returns he promised Elias. Peleg again assured Elias that his investment strategy would pay off, and reminded him that his principal investment was guaranteed, and thus Elias had nothing to be concerned about. Elias was not experienced in futures trading,

and he reasonably relied on Peleg's representations, including Peleg's assurances that his investment was secure.

34. In reliance on Peleg's promise of returns of at least ten percent (10%), Elias told Peleg that he would not withdraw his funds from the TradeStation account, so long as Peleg kept Elias informed about his investment.

35. In or around February 2024, the balance in the TradeStation account rose to one hundred eighty-four thousand, two hundred eighty dollars and twenty-five cents ($184,280.25) and Elias was reassured by Peleg that Peleg's trading strategy was working.

36. On March 27, 2024, frustrated that Peleg's investment strategy was not delivering the results that Peleg promised, Elias withdrew one hundred thousand dollars ( $100,000.00) from the TradeStation account. The balance in the account after Elias's withdrawal was one hundred thousand, one hundred nine dollars and ninety-three cents ($100,109.93).

37. The balance in the TradeStation account continued to fluctuate over the next few months. By the end of September 2024, the balance in the account had fallen to sixty-eight thousand two hundred eighty-three dollars and two cents ($68,283.02).

38. In February 2025, the balance sunk below sixty thousand dollars ($60,000), and Elias contacted Peleg by telephone, demanding to know what was happening with his investment. Once again, Peleg reassured Elias that his investment strategy would pay off and asked Elias for more time to deliver the return he had promised him. Elias requested that Peleg provide him with a written confirmation of Peleg's guarantee that he would return the remaining principal investment amount of two hundred twenty-five thousand dollars ($225,000). Peleg refused to make this guarantee in writing.

39. Peleg continued to fail to keep Elias informed about his investment as Peleg promised he would. Further, Elias could only monitor his investment once a month when he received monthly account statements from TradeStation.

40. By the end of April 2025, the balance in the TradeStation account was eighteen thousand, two hundred twenty-one dollars and forty-two cents ($18,221.42). Upon learning this, Elias withdrew the remaining balance from the TradeStation account.

41. Peleg never paid Elias any portion of the ten percent (10%) returns that he had promised Elias to induce Elias to enter into an investing agreement with him.

42. By May of 2025, Elias had lost two hundred six thousand, seven hundred seventy-eight dollars and fifty-eight cents ($206,778.58) of the three hundred twenty-five thousand dollars ($325,000) investment he made with Peleg in reliance on Peleg's promises that: (1) Elias would be made whole in the event of any investment losses and (2) Elias would earn a return of ten percent (10%) on his investment with Peleg.

43. In or around May 2025, Elias attempted to reach Peleg to request that Peleg fulfill his promise to make Elias whole on his principal investment. Peleg ignored Elias's communications and did not respond.

44. The Commodity Futures Trading Commission (CFTC) requires individuals who handle customer funds or provide trading advice (Commodity Trading Advisor, or "CTA") to register with the National Futures Association (NFA) unless they are exempt from the registration requirement.

45. Peleg had represented to Elias that he was registered with the NFA.

46. In or around May 2025, when Elias searched for Peleg's name (and the name of his d/b/a "Ace of Trends") on the NFA registry, however, the search returned no results. At this point,

Elias realized that Peleg had lied to him from the outset about his licensing status—and likely about his trading experience and clients as well. Elias immediately contacted an attorney to discuss his options.

47.     On June 12, 2025, Elias's attorneys sent Peleg a formal letter demanding that Peleg provide proof of his registration (or exemption from registration) required by the CFTA to trade on his behalf. In the letter, Elias also demanded: (1) reimbursement for the two hundred eight thousand dollars ($208,000) that Elias invested with Peleg and which Peleg lost because of Peleg's unauthorized trading on Elias's behalf and (2) payment of Elias's reasonable attorney's fees.

48.     On June 16, 2025, Peleg contacted Elias through WhatsApp and stated that he was licensed and that his licensing documentation was available via the trading app TradeStation.

49.     Elias was unable to find any licensing documentation for Peleg or his d/b/a "Ace of Trends" on the TradeStation app.

50.     In a later WhatsApp message on June 17, 2025, Peleg changed his story about his license and now claimed that he was exempt from the CEA's registration requirements. Peleg provided no support or evidence supporting his claim that he was exempt from the CEA licensing requirement.

51.     Peleg has not reimbursed Elias for any of the investment losses that Elias incurred because of Peleg's trading strategy even though Peleg repeatedly promised Elias that he would make him whole if Elias agreed to invest with him. Peleg also has not paid Elias any portion of the ten percent (10%) returns he promised to Elias as an inducement for Elias to enter into an investment agreement with him.

## CAUSES OF ACTION

### COUNT I
### Violation of Commodity Exchange Act Antifraud Provisions
### (7 U.S.C. § 6b)

52.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

53.     Peleg, communicating from Florida with Elias in New York, by telephone, text, and email, promised Elias returns of at least ten percent (10%) and guaranteed his entire principal investment in an effort to convince Elias to contract with Peleg to trade futures on Elias's behalf.

54.     Additionally, to induce Elias to conduct trading business with him, Peleg exaggerated his trading experience and lied to Elias about his licenses and certifications.

55.     Peleg made the foregoing representations to Elias with an awareness that Elias was not a sophisticated investor in futures markets and that these representations would be material to Elias's decision to invest with him.

56.     Peleg knowingly misrepresented his own qualifications.

57.     Peleg was reckless in promising ten percent (10%) returns, particularly considering his own lack of experience in futures trading, which he misrepresented to Elias.

58.     After convincing Elias to enter into an agreement to trade with him, Peleg did ultimately trade on Elias's behalf on the futures market.

59.     Over the course of the relationship, Peleg lost two hundred six thousand, seven hundred seventy-eight dollars and fifty-eight cents ($206,778.58) of Elias's total investment of three hundred twenty-five thousand dollars ($325,000).

## COUNT II
### Violation of Commodity Exchange Act Requirement for Commodity Trading Advisors to be registered if not exempt
### (7 U.S.C. § 6m)

60.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

61.     Peleg represented to Elias that Peleg had all the necessary licenses required to trade futures on Elias' behalf. Elias reasonably relied on Peleg's representation that he was a licensed futures trader in entering into an investment agreement with Peleg.

62.     Peleg made these representations from Florida, on telephone calls with Elias who was in New York.

63.     On information and belief, Peleg's representation that he was a licensed futures trader was false. On information and belief, Peleg has never been registered with the Commodity Futures Trading Commission as a commodity trading advisor.

64.     On information and belief, Peleg did not qualify for an exemption from the registration requirement under the CEA.

65.     As a direct and proximate result of Peleg's unlawful conduct, Elias has suffered damages in an amount to be proven at trial.

## COUNT III
### Fraudulent Inducement to Contract

66.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

67.     Peleg knowingly made false statements of material fact to Elias concerning Peleg's experience as a futures trader, the funds under his management, his licensure and registration with the NFA, and his ability to generate promised returns of at least ten percent (10%).

11

68.     Peleg knew these statements were false when he made them. Specifically, Peleg knew the truth regarding his trading history and experience, knew the truth regarding his clients and the funds under his management, and that he was not a licensed futures trader.

69.     Peleg made these false statements to convince Elias to enter a contract with Peleg for the investment of funds to be traded on the futures exchange, TradeStation.

70.     Elias is not a sophisticated investor and reasonably relied on Peleg's representations regarding his experience, licensure, and ability to deliver on the promises he made Elias: (1) to make Elias whole on his principal investment should Elias incur any trading losses due to Peleg's trading and (2) to provide at least a ten percent (10%) return on Elias's principal investment. In reliance on Peleg's promises, Elias accepted Peleg's offer.

71.     As a direct and proximate result of Peleg's unlawful conduct, Elias has suffered damages in an amount to be proven at trial.

## COUNT IV
## Negligent Misrepresentation

72.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

73.     Peleg, while conducting business with Elias, supplied Elias with false information for the purpose of inducing Elias to: (1) invest money with Peleg for the purposes of futures trading and (2) continue to keep his money in the TradeStation account even when Peleg's investment strategy appeared to be failing.

74.     Peleg supplied this false information to Elias with the knowledge that the false information would impact Elias' investment decisions. Indeed, had Elias known that Peleg had provided him with false information, Elias would not have invested with Peleg in the first place.

12

75.     Peleg supplied this false information to Elias knowing that Elias was not a sophisticated futures investor.

76.     Peleg failed to exercise reasonable care or competence in communicating the false information to Elias.

77.     Elias justifiably and reasonably relied on Peleg's misrepresentations regarding his experience, trading strategies, and other false information.

78.     As a direct and proximate result of Peleg's negligent misrepresentation, Elias has suffered damages in an amount to be proven at trial of at least two hundred six thousand, seven hundred seventy-eight dollars and fifty-eight cents ($206,778.58).

**COUNT V**
**Breach of Fiduciary Duty**

79.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

80.     When Elias agreed to allow Peleg to operate at his futures broker, Peleg requested, and Elias granted Peleg discretionary authority to trade on Elias's behalf.

81.     Peleg represented to Elias that he was a registered and licensed trader.

82.     By virtue of his relationship with Elias as a futures broker, Peleg owed Elias the fiduciary duties of loyalty, honesty, and care.

83.     Elias relied on Peleg's representation that he was a registered and licensed trader in accepting his offer and considered him to be a fiduciary.

84.     Peleg breached his fiduciary duties owed to Elias by (1) misrepresenting the risks and likely returns of his investment strategy, (2) engaging in self-dealing, (3) misusing Elias's funds, (4) failing to act in Elias' best interests, including by failing to keep Elias informed over the

status of his investment and by repeatedly lying to and misleading Elias about his investment strategy, and/or (5) engaging in excessive trading to receive commissions.

85.     The breach was knowing, intentional, or at least reckless, as Peleg was aware he misrepresented his status and at least should have been aware that his promise of ten percent (10%) returns misrepresented the risks associated with futures trading.

86.     These breaches caused Elias to lose the majority of his investment.

87.     As a direct and proximate result of Peleg's breach, Elias has suffered damages in an amount to be proven at trial of at least two hundred six thousand, seven hundred seventy-eight dollars and fifty-eight cents ($206,778.58).

**COUNT VI**
**Breach of Contract**

88.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

89.     A valid and enforceable contract existed between Elias and Peleg.

90.     Peleg offered to trade futures on behalf of Elias, promising a rate of return of at least ten percent (10%) and promising to make Elias whole on his principal investment in the event of any losses due to Peleg's trading. In exchange, Peleg would be entitled to twenty percent (20%) of the profits from his trading of Elias's money.

91.     Elias accepted Peleg's offer.

92.     Elias fully performed his obligations under the contract by investing three hundred twenty-five thousand dollars ($325,000) into the TradeStation account and executing the necessary authorizations allowing Peleg to trade on his behalf.

93.     Peleg breached the contract by failing to perform his obligations, namely by not providing Elias with the ten percent (10%) returns that Peleg had promised, and by not making

14

Elias whole on his principal investment after Peleg lost two hundred six thousand, seven hundred seventy-eight dollars and fifty-eight cents ($206,778.58) of Elias's trading investment.

94.     As a direct and proximate result of Peleg's breach, Elias has suffered damages in an amount to be proven at trial.

## COUNT VII
## Promissory Estoppel

95.     Elias repeats and incorporates the allegations in paragraphs 1-51 of this Complaint as if fully set forth herein.

96.     Peleg offered to trade futures on behalf of Elias, orally promising a rate of return of at least ten percent and that Peleg would make Elias whole on his principal investment in the event of any losses as a result of Peleg's trading, In exchange, Peleg would be entitled to twenty percent (20%) of the profits from his trading of Elias's money.

97.     Peleg made these oral promises knowing that Elias would rely on them.

98.     In reasonably reliance on Peleg's promises, Elias accepted Peleg's offer and invested three hundred twenty-five thousand dollars ($325,000) into the TradeStation account and executing the necessary authorizations allowing Peleg to trade on his behalf.

99.     Peleg broke his promises to Elias, namely by not providing Elias with the ten percent (10%) returns that Peleg had promised, and by not making Elias whole on his principal investment after Peleg lost two hundred six thousand, seven hundred seventy-eight dollars and fifty-eight cents ($206,778.58) of Elias's principal trading investment.

100.    As a direct and proximate result of Elias's reliance on Peleg's promises, Elias has suffered damages in an amount to be proven at trial.

15

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief against the Defendants:

A. An order awarding compensatory damages to Plaintiff in an amount to be determined at trial, but not less than $206,778.58;

B. Rescission and restitution, or, in the alternative, disgorgement of all monies obtained by Defendant as a result of his wrongful conduct;

C. Treble damages, statutory damages, punitive damages, and/or exemplary damages as authorized by law, including under the Commodity Exchange Act;

D. An award of Plaintiff reasonable attorney fees, costs, and other expenses for Defendant's willful conduct;

E. Awarding Plaintiff all pre- and post-judgment interest at the maximum rate provided by law; and

F. Ordering such other and further relief the Court deems just and proper.

Dated: September 22, 2025                              Respectfully submitted,


JAYARAM PLLC
Vivek Jayaram
54 West 21st Street, Suite 801
New York, NY 10010
Phone: 646.596.1322
Email: vivek@jayaramlaw.com

*Attorneys for Plaintiff*

16